FILED

2006 Mar-24  PM 04:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| MILAN NIKOLIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 6: 01-cv-3274-CLS-PWG |
| | ) | |
| JOHNNY BATES, M.D., et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION

This is an action filed pursuant to 42 U.S.C. § 1983 by Milan Nikolic ("plaintiff"), a former prisoner in the custody of the Alabama Department of Corrections ("ADOC"). Plaintiff filed his *pro se* complaint on December 17, 2001, asserting that defendant Dr. Johnny Bates, a physician at Hamilton Aged & Infirmed Correctional Facility ("HAI"), violated rights guaranteed plaintiff by the Eighth Amendment's proscription against cruel and unusual punishment.[1] The parties waived a jury trial and consented to the jurisdiction of the undersigned magistrate judge to conduct an evidentiary hearing and enter a judgment in this matter. An evidentiary hearing commenced on March 13, 2006, and ended on March 14, 2006.

---

[1] Plaintiff sued additional defendants, made additional claims, and requested declaratory and injunctive relief in his original pleadings. However, with the exception of the claims against defendant Bates discussed in this order, all other defendants and claims have been dismissed with prejudice, and all requests for declaratory and injunctive relief have been rendered moot.

1

At the hearing, plaintiff testified in his own behalf[2] and identified seventeen (17) exhibits[3], (16) of which were received.  Defendant Johnny Bates also testified. presented the deposition testimony of Dr. Rigsby, a neurosurgeon, and identified (5) exhibits, (4) of which were received.[4]

## LEGAL STANDARDS

### I.  Constitutional Standard – Elements of plaintiff's Eighth Amendment claims.

The United States Supreme Court has held that it is only deliberate indifference to serious medical needs which is actionable under 42 U.S.C. § 1983.  *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct 285, 50 L.Ed.2d 251 (1976).  The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *Bass v. Sullivan*, 550 F.2d 229 (5th Cir.), *cert. denied*, 434 U.S. 864, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977).  Mere negligence is insufficient to support a constitutional claim.  *Fielder v. Brossard*, 590 F.2d 105 (5th Cir. 1979).  As stated in *Estelle, supra*, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  429 U.S. at 106.  Therefore, an accidental or inadvertent failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment.  *See Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980).  Neither will a mere difference of opinion between an inmate and the

---

[2]  Plaintiff also called inmate Johnny Cameron as a witness, but Mr. Cameron had no personal knowledge of any information material or relevant to plaintiff's action, contrary to an affidavit alleged to have been given by Cameron during summary judgment proceedings.

[3]  Plaintiff's received exhibits shall be referred to as P1through P17.  Plaintiff identified a July 7, 1998, x-ray of his cervical spine as Exhibit P11, but same was not received.

[4]   Defendant's received exhibits shall be referred to as D1, D3, D7 and D16. Defendant identified plaintiff's 2005 prison medical records as Exhibit D17, but after objection, same was not received because it is too remote to be considered material and relevant to plaintiff's claims against defendant Bates, all of which necessarily occurred between October 30, 2000, and February 2, 2002.

institution's medical staff as to treatment and diagnosis alone give rise to a cause of action under the Eighth Amendment.  *Smart v. Villar*, 547 F.2d 112 (10th Cir. 1976).  *See also Estelle v. Gamble, supra*, at 106-08.

A "prison official's deliberate indifference to the serious medical needs of a prisoner 'constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment.'" *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003) *quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Denial of medical care can constitute cruel and unusual punishment "because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose." *Wilson v. Seiter*, 501 U.S. 294, 308 (1991)(citing *Estelle v. Gamble* 429 U.S., at 103)).  In general,

> [t]o show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry.  *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).  First, a plaintiff must set forth evidence of an objectively serious medical need.  *Taylor*, 221 F.3d at 1258; *Adams*, 61 F.3d at 1543.  Second, a plaintiff must prove that the prison official acted with an attitude of 'deliberate indifference' to that serious medical need.  *Farmer* [*v. Brennan*,] 511 U.S. [825], 834 [(1994)], *McElligott v. Foley*, 182 F.3d [1248], 1254 [11th Cir. 1999], *Campbell v. Sikes*, 169 F.3d [1353], 1363 [(11th Cir. 1999)].[5]

"[A] serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (citing *Hill v. DeKalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176m 1187 (11th Cir. 1994) (and omitting internal quotation marks and citation)).

---

[5]  *Id.* Dr. Bates is not a "prison official" per se.  However, since a private individual under contract with the state to provide medical services to state inmates can be considered a state actor for § 1983 purposes when the quality of medical services provided by the individual is at issue, the terminology is equally applicable to Dr. Bates.  *Id.* at 1239.

Deliberate indifference can be shown in a variety of ways.  As the Eleventh Circuit noted in

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995):

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference.   Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference.   "A doctor's decision to take an easier and less efficacious course of treatment" also constitutes deliberate indifference.   Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.  (citations omitted).

The Eleventh Circuit also held in *Howell v. Evans*, 922 F.2d 712, 720 (11th Cir.), *vacated*, 931 F.2d

711 (11th Cir. 1991), *reinstated by unpublished order* (June 24, 1991), cited in *Howell v. Burden*,

12 F.3d 190, 191 (11th Cir. 1994)):

> The standard for deliberate indifference focuses on the failure to provide or allow proper treatment in the face of information which reasonably should compel action.  Such deliberate indifference is often manifest by a refusal to act when certain actions were or should have been known to be necessary, rather than simply a failure to act.

An official also acts with deliberate indifference when he intentionally delays providing an

inmate with access to medical treatment, knowing that the inmate has a life-threatening condition

or an urgent medical condition that would be exacerbated by delay.  *See Hill*, 40 F.3d at 1186 ("cases

stating a constitutional claim for immediate or emergency medical attention have concerned medical

needs that are obvious even to a layperson because they involve life-threatening conditions or

situations where it is apparent that delay would detrimentally exacerbate the medical problem");

*Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994).  Delay in access to medical treatment

can violate the Eighth Amendment, *Estelle*, 429 U.S. at 104-05, 97 S. Ct. at 291, when it is

"tantamount to 'unnecessary and wanton infliction of pain,'" *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.) *per curiam, cert. denied*, 496 U.S. 928 (1990). *See also*, *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999).

"In contrast, delay or even denial of medical treatment for superficial, non-serious physical conditions does not constitute an Eighth Amendment violation." *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1187-88. A medical need is considered serious when delay results in an inmate's suffering "a lifelong handicap or permanent loss." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987). An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Hill, supra*, at 1188. Further, whether the length of the delay establishes deliberate indifference "depends on the nature of the medical need and the reason for the delay." *Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994). Therefore, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

## II.  Evidentiary Standards and Rulings

### A.  Burden of Proof.

It is plaintiff's burden to prove each and every element of his Eighth Amendment claims against defendant Bates by a preponderance of the evidence. A "preponderance of the evidence" is an amount of evidence which is enough to persuade the court that plaintiff's claim is more likely true than not true.

In deciding whether any fact has been proved by a preponderance of the evidence, the court may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them. If the proof fails to establish any essential part of plaintiff's claim by a preponderance of the evidence, the court should find for defendant Bates.

In the case *sub judice*, plaintiff must prove the following essential elements of his claim by a preponderance of the evidence: (1) that he suffered from a serious medical need, (2) that defendant Bates was aware of his serious medical need, (3) that defendant Bates with deliberate indifference failed to provide him necessary medical care, (4) that defendant Bates was acting under color of law[6], and (5) that defendant Bates' acts were the proximate or legal cause of plaintiff's damages.

**B.  What constitutes evidence.**

Evidence comes in various forms such as the sworn testimony of witnesses, exhibits, and stipulations. In addition, there are two different kinds of evidence—direct evidence and circumstantial evidence.

Direct evidence can prove a material fact by itself. It does not require any other evidence. It does not require the court to draw any inferences. A witness's testimony is direct evidence when the witness testifies to what he saw, heard, or felt. In other words, when a witness testifies about what is known from his own personal knowledge by virtue of his or her own senses, what he or she sees, touches, or hears—that is direct evidence. The only question is whether the court believes the

---

[6]    This element is established. *See supra,* n. 5, and the description of the parties set out Section I of the findings of fact. *Infra.* p. 9.

witness's testimony.  A document or physical object may also be direct evidence when it can prove a material fact by itself, without any other evidence or inference.  The court may, of course, have to determine the genuineness of the document or object.

Circumstantial evidence is the opposite of direct evidence.  It does not prove a material fact by itself.  Rather, it is evidence that tends to prove a material fact when considered together with other evidence and by drawing inferences.  The strength of the inferences arising from circumstantial evidence is for the court to determine.  Inference from circumstantial evidence may be drawn on the basis of reason, experience, and common sense.  Inferences may not, however, be drawn from guesswork, speculation, or conjecture.

### C.  What constitutes relevant evidence.

Plaintiff's claims against defendant Bates arose between October 30, 2000, and February 2, 2002.  Evidence pertaining to plaintiff's medical condition, some generated outside the time period between October 30, 2000, and February 2, 2002, including documentary exhibits were received into evidence.  However, the court repeatedly stressed to both parties that it would determine the relevance of this evidence at the appropriate time.

After careful consideration, the court finds that the only evidence relevant to plaintiff's claims against defendant Bates is found in testimony and exhibits concerning plaintiff's condition from January 2000, until December 2002.  Such a time period encompasses plaintiff's medical care for entire year of 2000, 2001, and 2002, and chronologically follows plaintiff's condition approximately nine (9) months before and eleven (11) months after he was under the care of Dr. Bates.  The court specifically finds that all other documentary evidence pertaining to plaintiff's

medical condition before January 2000 and after December 31, 2002,  is too remote in time to be considered relevant in this court's assessment of defendant Bates' treatment of plaintiff between October 30, 2000, and February 2, 2002.

### *Preamble*

Having discussed the standards applicable in this action, and after hearing the testimony presented and considering the relevant evidence received at the evidentiary hearing, the undersigned must now make findings of fact and conclusions of law with regard to plaintiff's claims. Specifically, the court must determine whether, by a preponderance of the evidence, plaintiff has proven defendant Bates more likely than not violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment while plaintiff was an inmate at Hamilton Aged and Infirmed Correctional Facility, between October 30, 2000, and February 2, 2002, by: (1) refusing to allow plaintiff to have his walking cane and cervical collar; (2) failing to affirm plaintiff was medically unfit to live in an outside trailer; and (3) failing to examine plaintiff and provide treatment for his medical condition.

### FINDINGS OF FACT

**I.  Parties.**

Milan Nikolic ("plaintiff"), was an inmate in the Alabama penal system from 1998 to June 2002.  While plaintiff served his sentence at several state institutions throughout Alabama, he was in the custody of the Hamilton Aged and Infirmed Correctional Facility ("HAI") from October 30, 2000, to February 2, 2002.

Defendant Johnny Bates ("Bates"), is a doctor licensed to practice internal medicine in the State of Alabama.   Dr. Bates has been a physician in the Alabama prison system for 14 years. During all times pertinent to this lawsuit, Dr. Bates was employed by NaphCare, Inc., a company contracted with the Alabama Department of Corrections to provide healthcare to inmates.   Between October 30, 2000, and February 2, 2002, Dr. Bates provided health care services to inmates at HAI.

## II.  Relevant background.

Plaintiff was inmate at Bibb Correctional Facility from January 2000, to April 2000, and Kilby Correctional Facility from April 2000, to October 2, 2000.   He spent the bulk of October 2000, at  Bullock Correctional Facility, before being transferred to HAI on October 30, 2000.   Plaintiff's continued pain complaints between January 2000, and September 2000, led treating doctors to prescribe certain medication and "benefits" described as a cervical collar, cane, bottom bunk profile and an extra mattress.

Based upon plaintiff's frequent complaints of pain while at Bibb County Correctional Facility, Dr. Miller ordered an MRI be performed.   On March 1, 2000, the results of the test showed mild cervical stenosis with no spinal cord impingement.   (Exhibit P2).   Plaintiff's continuing symptomatic complaints of pain prompted a referral to a Montgomery neurosurgeon named Dr. Rigsby.

At his deposition, Rigsby was asked to review medical records created as a matter of course during the period he provided medical care to plaintiff.   Dr. Rigsby testified that he first examined plaintiff on April 25, 2000.   During this examination, plaintiff complained of neck pain, and right upper and lower extremity pain.   Rigsby reviewed a copy of the MRI performed in March 2000.

9

Since the pain plaintiff claimed to be experiencing was not consistent with the results of the MRI, Dr. Rigsby felt it prudent to request a myelogram. A myelogram is a more accurate testing instrument than an MRI.

On June 16, 2000, a cervical myelogram was performed. (Exhibit P1). The results of the myelogram showed a slight thickening of the nerve root, however Dr. Rigsby did not believe the thickening was the cause of plaintiff's complaints. An extradural defect was noted at C5-C6, and diagnosed as mild cervical stenosis.[7] Rigsby opined that as many as 1 out of 8 persons have the same mild cervical stenosis as plaintiff, and approximately 80% of those individuals are not even aware of the condition because it is asymptomatic.

In addition to observing the MRI and myelogram, Rigsby conducted his own neurological examination of plaintiff to objectively assess the source and extent of plaintiff's complaints of pain and weakness. Rigsby stated plaintiff was extremely difficult to test because he would not give his full effort and was "hysterical in many ways." Thus, the best conclusion Rigsby could draw was that it was possible that plaintiff had some weakness at the C5-C6 level, but he could not be sure because it was clear that the plaintiff was attempting to influence the outcome of the exam. For instance, plaintiff was asked to use his hand to squeeze Dr. Rigsby's fingers in order to test grip strength. Plaintiff did so, but Rigsby barely felt pressure. Yet, when Rigsby asked plaintiff to use the same hand in a pushing motion against Rigsby's hand, Rigsby felt a palpable grip when plaintiff pushed.

---

[7]       Many medical terms have been used to describe plaintiff's condition, the most prevalent of which are cervical stenosis and degenerative disc disease.

Nevertheless, as the only possible explanation for plaintiff's symptomatic complaints, if correctly reported, appeared to be the C5-C6 cervical stenosis.  Rigsby offered plaintiff a surgical procedure known as cervical diskectomy and fusion which can correct that condition. (Exhibit P10). Rigsby explained that this surgery is very common, and approximately 300 per year are performed in his practice, 100 of which are on the neck.  With regard to the pros and cons of surgery, Rigsby stated that he believed the surgery might help, and the potential benefits outweighed the risk.  The procedure takes less than 2 hours, and since plaintiff was a prisoner, Rigsby would monitor him a couple of days at the hospital post-surgery to ensure he was recuperating properly.  Rigsby postulated that plaintiff's neck impairment after surgery may be 10 % due to stiffness, but he doubted plaintiff would even notice the impairment because the stiffness was already present.

With an eye toward surgical repair and because of plaintiff's complaints, Dr. Rigsby felt it was appropriate to prescribe Tylenol with Codeine (a narcotic) on an as needed (p.r.n.) basis prior to surgery and during post-surgery recuperation.  Plaintiff was prescribed such medication and his surgery was planned for September, 2000.  Plaintiff was also prescribed other non-narcotic, anti-spasm and anti-inflammatory medications at various intervals by DOC doctors, which will be discussed in greater detail further herein.

A conflict between plaintiff and medical personnel arose while plaintiff was awaiting surgery at Jackson Hospital on September 25, 2000.  Plaintiff claims he did not receive surgery because he refused to sign a waiver of liability form.[8]  Dr. Rigsby testified that plaintiff refused to have the

---

[8]    A careful reading of plaintiff's pre-trial narrative statement and contemporaneous medical records shows that plaintiff was housed in a segregation cell prior September 25, 2000, because he hit another inmate in the head (causing the inmate to be taken to the hospital) and was giving away cigarettes.  Plaintiff did not believe the conditions in the stark segregation cell would be conducive to his healing process, and asked that he be allowed

surgery, and was irritable, angry and complaining loudly about the quality of medical treatment he received from the Department of Corrections.[9]  For whatever reason the surgery was not performed, plaintiff was returned to the penitentiary.[10]

On October 2, 2000, plaintiff was transferred to Bullock Correctional Facility[11], where he remained until October 30, 2000, when he was transferred to HAI.  (Exhibit P5).  It is imperative to note, and this court explicitly finds that plaintiff's prescription for Tylenol with Codeine was discontinued at Bullock Correctional Facility on October 27, 2000, three (3) days before he ever arrived at HAI.  Moreover, as explained further herein, plaintiff's prescriptions for the non-narcotic anti-spasm and anti-inflammatory medications Robaxin and Percogesic ran out within the month after he arrived at HAI, and were not renewed.  Thus, in spite of plaintiff's accusations toward Dr. Bates, it is quite clear and this court finds from the chronology of events that Dr. Bates had absolutely nothing to do with the discontinuation of plaintiff's prescription medication, narcotic or non-narcotic, when plaintiff was transferred to HAI.

---

out of segregation post-surgery. This request was not granted.  Therefore, plaintiff refused to sign a waiver of all liability associated with his operation, and stated he wanted to stay the surgery until the conditions he desired were available.  Plaintiff has never had corrective surgery.

[9]    Highlighting another area of inconsistency in plaintiff's case is the fact that, at the evidentiary hearing, plaintiff repeatedly praised the care he received from all other DOC physicians and staff except Dr. Bates.  However, in addition to plaintiff's September 25, 2000, complaints about DOC staff to Dr. Rigsby (this court credits Dr. Rigsby's testimony), the relevant medical records are replete with notations concerning plaintiff's expressed dissatisfaction with many DOC medical providers, not just Dr. Bates.

[10]   In the 6 months preceding his transfer, there are, at times, hourly and daily nurse's notes, written contemporaneously with their observations of plaintiff.  Over the course of this time period, plaintiff complained of pain and made increasingly frequent requests for pain medication.

[11]   Plaintiff insists he did not request his transfer from Bullock to HAI.  However, there is a notation in the medical records indicating plaintiff was trying to influence his transfer HAI, and that same would be attempted in plaintiff's behalf.

On his October 30, 2000, arrival at HAI, it is undisputed that plaintiff possessed a cervical collar, walking cane, three (3) prescription medications, and was allowed to have an extra mattress. Dr. Bates described the first prescription as Lopid, a cholesterol lowering drug.  The second was a 30 day prescription for Robaxin, a muscle relaxant.  Bates stated that Robaxin is prescribed for short term muscle spasms, and although there is no clear evidence the drug worked for plaintiff's condition, it does have a sedative effect.  The third medication was a 10 day prescription written on October 27, 2000, for Percogesic, a pain medication that is "a little stronger" than over the counter Tylenol.  Bates testified medications such as Percogesic are only temporary, pain masking solutions for plaintiff's difficulties, because the real solution for plaintiff's diagnosed condition is surgery.

While Bates testified that non-narcotic anti-inflammatory medications are appropriate for pain management, pain management through use of long term narcotics is not appropriate because they are addictive, have no curative effect and plaintiff already had a positive drug abuse history. Bates' position on the subject was echoed by Dr. Rigsby, who stated that pain management by way of long term narcotic use for benign conditions (as opposed to malignant conditions such as cancer) is inappropriate.  Dr. Rigsby also affirmed that an individual's physical, social and medical background were pertinent in determining a treatment plan.  As a former counselor at the Betty Ford Center, Rigsby stated that pain management for benign conditions in individuals with a drug abuse history by way of non-narcotic medications is a reasonable treatment plan.

In spite of the nomenclature, inmates transferred to HAI are not presumed medically needy unless a chronic condition is recorded in inmate's chart on arrival.  Bates testified that HAI houses many sick inmates as well as a lot of inmates who have no medical problems, but for security reasons

13

or other reasons were "the worst inmates." Thus, if no chronic condition is listed on the inmate's transfer form, then examination and/or treatment is not given upon arrival at HAI. In fact, bi-annual physical examinations are only performed on HAI inmates over the age of 50. Otherwise, to seek medical attention, plaintiff and defendant acknowledged that inmates must fill out a medical request slip.

Plaintiff did not dispute that he was not listed as having a chronic condition on his intra-state transfer form to HAI. He also testified he was placed in a solarium cell, the location of which he himself stated gave him easy access to the infirmary ("right around the corner") and the rest of the entire facility. Plaintiff voiced no complaints about being housed in the solarium cell, other than the cell did not have windows. He was perturbed that when he arrived at HAI, he possessed a cervical collar, a walking cane, and was allowed to have an extra mattress, but was stripped of these benefits by a corrections officer although he offered an official "pink slip" indicating he was allowed to have same.

Dr. Bates testified and plaintiff did not dispute that in the event an inmate has medical difficulties then, according to procedure, a sick call slip is filled out and placed in a drop box. Dr. Bates testified that the sick call slips are reviewed and the inmates are initially triaged by the nursing staff.[12] Those patients in need of the care of a physician are placed on a list, and their medical folders are pulled. Security staff then make an announcement to the chosen inmates to line up for

---

[12]    There are medical conditions for which nurses are charged with responsibility. For instance, there is written protocol on the manner in which nurses are to treat Athlete's Foot. As such, an inmate suffering from Athlete's Foot is treated according to protocol and is not placed on the physician's call list.

sick call, and Dr. Bates examines the inmates until all have been seen.  Generally, Dr. Bates conducts his visits once per week, but is also available to see inmates on an urgent or emergency care basis.

Dr. Bates testified that he never refused to see a patient on the sick call lists.  Dr. Bates also testified that he reviewed plaintiff's medical file at HAI, and found no sick call slips/complaint forms except for one (1) in July 2001, and two (2) in December 2001, nor did plaintiff ever personally approach him asking for medical assistance.  While plaintiff testified he filed sick call slips daily, he does not deny that he had frequent opportunities to, but never directly approached Dr. Bates.

In any event, after being stripped of his benefits, plaintiff testified that he visited the infirmary to have his benefits returned but was told by Brandon Kinard, the Director of Nursing, that Dr. Bates had terminated same and that they would not be reinstated.  Plaintiff testified that he filled out sick call slips everyday and placed them in a drop box, but was never called to sick call.  At the evidentiary hearing, plaintiff had no explanation for the absence of sick call slips in his prison record from October 30, 2000, to July 31, 2001, and from the latter date to December 1, 2001, except to comment that the absence of the slips was "ironic."

### III.  Serious medical needs.

A threshold question is whether plaintiff has proved, by a preponderance of the evidence, that he suffered from serious medical needs while at HAI.  First to be considered is plaintiff's alleged serious medical need for a walking cane, cervical collar and medical fitness to live in an outside trailer.  Second, plaintiff's complaint that Bates never examined or treated him for a serious medical condition will be considered.  Where appropriate and relevant to proving if any of these claims constituted a serious medical need between October 30, 2000, and February 2, 2002, the court will

make findings based on additional evidence pertaining to plaintiff's medical condition from February 2, 2002, to December 31, 2002.

### A.  Walking cane, cervical collar and medical fitness to live in an outside trailer.

Plaintiff contends that while at HAI, he was denied his walking cane and cervical collar, and that they were medically necessary for his mobility, support, and relief for pain and discomfort while at HAI.  Plaintiff also declares he was medically unfit to be moved from his solarium cell to an outside trailer on November 30, 2001, where it is presumed he remained until his February 2, 2002, transfer to Kilby Correctional Facility.

Plaintiff testified he was in severe, torturous, intolerable pain.  He declared his condition was so severe Dr. Rigsby informed him if he fell down, he could be paralyzed or die.  Thus, he concludes it was cruel and unusual punishment for him to be without his benefits, and housed in the outside trailer.

Despite such graphic protests, plaintiff failed to provide sufficient credible evidence to prove, that, more likely than not, he suffered from a serious medical need for which lack of benefits or housing in an outside trailer were contraindicated.  First, plaintiff was housed in a solarium cell at HAI for eleven (11) of the thirteen (13) months he was in the custody of that facility.  Yet, the only complaint he voiced about conditions in his solarium cell was that it had no windows.  He also testified that his cell was right around the corner from the infirmary, and in a central location such that he was easily able to move anywhere in the facility.  At no time did he ever testify that he had any physical difficulties at the prison while housed in the solarium cell, and certainly did not assert

he was virtually bedridden in his cell because he had no walking cane or cervical collar. Thus, plaintiff's contention that he needed a walking cane and cervical collar at HAI is not credible.

Plaintiff argues medical doctors allowed him to have a cane before and after he was in the custody of HAI. Even if true, plaintiff has still provided no credible medical evidence that his cane was necessary while at HAI. A difference of opinion between medical providers as to care and treatment of a patient, much less between the patient and the same providers, is not proof of a serious medical need. Additionally, plaintiff did utilize a cane in present proceedings. In fact, he demonstrated walking with the cane in front of the bench. Plaintiff held his cane in his right hand. Dr. Bates testified and plaintiff does not dispute that he has always claimed and relevant medical records have always shown that plaintiff has complained of right sided weakness in his upper and lower extremities. Bates opined and plaintiff provided no evidence to refute that if he were truly experiencing right sided weakness, he would most certainly not be using his right arm to steady his walking cane and support his body. In Dr. Bates' opinion, if plaintiff's claims were true, it would be dangerous for plaintiff to rely on his right side so heavily. It did not escape the court's attention that after this testimony was elicited from Bates on the second day of the hearing, and a brief recess in the proceedings was had, plaintiff re-entered the court room and for first time was holding his cane in his left hand.

Additional evidence offered by plaintiff also completely fails to show that he had any serious medical need for a stiff cervical collar while he was housed at HAI. Plaintiff admitted that he himself stopped wearing the collar only 5 days after being prescribed it on May 15, 2000, because it caused him increased pain and rubbed his chin raw. He also declared that he only wore the collar

17

for a total  2.5 - 3 months after receiving it.  It is obvious that he stopped wearing the collar long before he arrived at HAI.

Plaintiff was not wearing a cervical collar during the hearing because he did "not want to"and explained the pain he was presently enduring was not manifesting itself in his neck.  Plaintiff also admitted that the pain in his neck waxed and waned while he was incarcerated.  In his expert opinion, unchallenged by plaintiff, Dr. Bates declared that constant wear of a stiff cervical collar for any patient was inappropriate because protracted use of such a collar will cause dangerous, even fatal weakness in the muscular-skeletal system of the patient's neck.  The type of collar plaintiff purports to have needed, according to Bates, is only appropriately prescribed to a patient for a short period of time, and at most, several weeks.

The foregoing facts convince the court not only that plaintiff's medical benefits were not necessary to assist with a constitutionally serious medical need for the 11 months plaintiff lived in the solarium cell, but also for the 2 months plaintiff resided in the outside trailer.  At the evidentiary hearing, plaintiff testified that his medical condition was sufficiently serious to prohibit him from being housed in the outside trailer.  Yet, his chief complaints about the trailer were that the space between the his bottom bunk and the upper bunk in the trailer was only 27 inches, as opposed to 50 inches in his solarium cell.  Plaintiff also complained that to get in and out of the trailer, he had to walk up 5 very unevenly spaced metal steps with no stable working rails to hold on to for support.

The court finds the credible evidence overwhelmingly shows plaintiff's medical condition was not so grievous that housing in the outside trailer created a serious medical need.  Plaintiff additionally offers no medical evidence or expert opinion to the contrary.  Since plaintiff admitted

that he was able to move freely about the prison for 11 months, and has not refuted any expert medical opinion about his benefits or the trailer, the court finds that plaintiff did not suffer from such a serious medical need that 13 inches between bunks and 5 metal steps possibly made any constitutional difference with regard to his medical condition.   It is also noted that plaintiff complained to the warden about the steps, and within approximately six (6) weeks, the metal steps were removed, replaced with even wooden stairs, and spaced at levels plaintiff testified he could use.

**B.  Failure to examine plaintiff and provide treatment**.

Plaintiff claims Dr. Bates was deliberately indifferent to his serious medical needs because Bates failed to provide neurological functioning therapy previously ordered, never once "laid a finger" on plaintiff for examination purposes, and refused to assist plaintiff with pain management while at HAI.

At the outset, the court finds plaintiff has failed to provide sufficient proof that Kilby Correctional Facility physicians, or any other physician ordered him to undergo any neurological functioning treatment, therapy, or like at HAI.  A careful review of the exhibit offered by plaintiff to support his contention that such treatment or therapy was ordered fails to provide sufficient proof of same.  (Exhibit P16).  This exhibit is plaintiff's discharge summary from Kilby Correctional Facility on October 2, 2000.  The portion of the summary relied on by plaintiff as ordering his therapy is found in the lower right hand corner, and is handwritten in the "Follow-up Treatment/ Plans."  *Id.*  What is placed in this section can be read two (2) different ways.  The interpretations are, "Re access (or Pl[an] access) neurological function [the letter "a" circled] 3 months Pt may return if he decides to have surgery."  The summary sheet appears to have been signed by Dr. Glover.

However the notation is read, it does not, as plaintiff asserts, command that he be given neurological functioning therapy.  At best, it can reasonably be interpreted to state something about access to plaintiff's neurological functioning or perhaps assessment or reassessment of same.  The court cannot and will presume any treatment was ordered, much less the type or nature of the treatment from a notation where the only clear language is, axiomatically, "Follow-up Treatment/Plans."

Plaintiff claims Dr. Bates refused to ever examine him or provide proper treatment, the latter of which, by process of elimination, can only be pain management.  The court will address the substance of the only three (3) occasions plaintiff and Dr. Bates met in person at the HAI infirmary, which were on July 31, 2001, December 7, 2001, and December 31, 2001.  Proper treatment and pain management for plaintiff's medical condition will be addressed concurrently.

In July 2001, plaintiff began experiencing difficulties with his teeth.  On July 29, 2001, he filled out a sick call slip requesting only emergency dental treatment.  Plaintiff was seen by Dr. Bates on July 31, 2001.  During this meeting, plaintiff complained about his teeth, neck and back pains. (Exhibit P6).  Dr. Bates testified he conducted a neurological examination of plaintiff in July 2001, although he gave almost no testimony as to what said examination actually involved other than watching plaintiff stand up and sit down, and plaintiff testified that Bates did not so much as lay a finger on him.

Bates also reviewed plaintiff's medical history at that time, which would have included the 2000 MRI and myelogram.  In addition to examining plaintiff's medical profile for the purpose of

effectuating a treatment plan[13], Dr. Bates also reviewed plaintiff's social history.  Bates testified, without objection, that a 1997 psychological profile of plaintiff described him as an angry, argumentative, resentful, demanding, obnoxious, and hostile individual, prone to make vague emotional and physical complaints.  There was also admitted prior poly-substance abuse history with the drug choice being heroine and cocaine in plaintiff's file.  To Bates, this prior substance abuse is a significant issue in formulating a treatment plan because of the danger of exaggerated physical symptoms.

Therefore, Bates prescribed Motrin and ibuprofen for plaintiff's pain for a short period of time.  Motrin and ibuprofen are nonsteroidal, anti-inflammatory medications.  Dr. Bates testified that these medications are good for the type of condition plaintiff suffered and are safe to utilize on a long term basis.  He emphasized that use of narcotic medications for plaintiff's condition on a long term basis was not curative and also dangerously addictive.  Dr. Bates wrote in his notes that plaintiff's neurological functioning appeared to be within normal limits.  Nevertheless, Bates wrote plaintiff a 600 mg Motrin T.I.D. for for 10 days.  Plaintiff did not dispute Bates' opinion regarding proper pain management medication.  Plaintiff also testified that throughout the duration of his stay at HAI, he purchased non-steroidal, anti-inflammatory medication himself through the prison canteen and bartered medication from other inmates.

---

[13]/     Dr. Bates later admitted that he never developed a treatment plan for plaintiff.

It is undisputed that plaintiff was moved from his solarium cell to an outside trailer on November 30, 2000.[14]   The next medical request or complaint form introduced at the hearing is plaintiff's December 1, 2001, NaphCare complaint form, in which he asserts that his condition prohibits such a move.   Plaintiff was examined on December 7, 2001 by  Dr. Bates, who plaintiff contends refused to help him.  Bates testified that he determined plaintiff was a malingerer, or a person who "is trying to gain the system."[15]   It was during this meeting plaintiff testified Dr. Bates informed plaintiff to sign up and pay $3.00 for sick call one time, ten times, or a hundred times, but that Dr. Bates would not do anything to help him.

Plaintiff visited a nurse on December 8, 2001, and complained that Dr Bates would not help, but he was not referred to the doctor.  On December 28, 2001, Nurse Sizemore more completed a body chart on plaintiff.  This body chart was not ordered by Bates but he did sign off on it.   Dr. Bates examined plaintiff again on December 31, 2001.  Bates reported plaintiff did complain of pain at the base of his neck to the top head, which radiated pain down the spine and legs, and difficulty walking.  Bates again reviewed the MRI and saw no evidence of spinal cord impingement, and only mild impingement as to the myelogram.  Again, plaintiff was prescribed Motrin and ibuprofen for several days.

---

[14]	This undisputed fact provides the prime example of plaintiff's inconsistent testimony at the evidentiary hearing. Plaintiff initially stated that he was living in the trailer as early as July 2001.  Then, he clarified himself and asserted that he was moved to the trailer by Dr. Bates because he filed a lawsuit against Bates.  However, such an accusation is chronologically impossible because plaintiff did not file his  lawsuit until December 17, 2001, almost (3) weeks after plaintiff conceded he had been moved to the trailer.

[15]	There are nurse's notes during December 2001, to the effect that plaintiff was seen moving chairs in the solarium and walking without difficulty in the chow line. The latter assertion was made by Nurse Brandon Kinard.  Plaintiff strongly denies that he engaged in such behavior at that time.

Bates unreasonably insists he was not aware of plaintiff's lawsuit when plaintiff was referred for testing with Dr. Miller at Kilby Correctional Facility on 1/28/02.[16]  Dr. Miller reexamined plaintiff at Kilby Correctional Facility in February 2002, and on February 13, 2002, plaintiff informed him that Darvocet only thing that helped with the pain.  Miller would not distribute a narcotic medication absent further investigation.  (Exhibit D3).  Plaintiff denies he made such a request and asserts he would not have done so because he is allergic to Darvocet.  The court does not credit plaintiff's assertion because plaintiff's recorded medical allergies in the relevant medical records shows he has never reported allergies to Darvon or Darvocet. Dr. Miller then prescribed Naprosyn, an anti-inflammatory medication, and Neurontin.[17]

Dr. Miller also administered an electric conduction and muscle strength exam.  Plaintiff scored  4 and 5 on all parts of the exam.  A score of 5 is interpreted to be within normal limits.  In the face of this important material fact, plaintiff simply stated Dr. Miller did not go over the test results with him, but did tell him the test showed "one abnormal function."  On February 8, 2002, plaintiff is recorded as requesting Tylenol with Codeine, but Dr. Miller refused and increased plaintiff's Neurontin prescription.

Dr. Miller expressed concern that plaintiff may be seeking secondary gain, but he decided to give plaintiff the benefit of the doubt.  On March 8, 2002, another MRI exam at C5-C6 cervical

---

[16]  (Exhibit P12).  Dr. Bates also insisted he referred plaintiff to Kilby Correctional Facility for assessment with Miller in February 2002, out of concern plaintiff might be suffering from Multiple Schlerosis.  However, he later conceded that he did so as part of a group effort with prison officials.  (Exhibit D7).  Thus, the court does not credit Dr. Bates' testimony with regard to these matters.

[17]  Naprosyn is also the generic form of Aleve.  Plaintiff stopped taking Neurontin after several days because it was "not helping."

spine showed severe interspace narrowing and mild cord flattening.  Plaintiff had to be convinced by Dr. Miller to agree to visit Dr. Rigsby about his problem.  However, before plaintiff could be reexamined by Dr. Rigsby in May 2002, plaintiff's family threatened to sue Rigsby if he provided any treatment to plaintiff.  Therefore, Rigsby terminated his doctor/patient relationship with plaintiff.

The court finds and plaintiff provided no evidence to refute the fact that he took no pain medications for pain in May 2002, and June 2002, although he held a prescription for over the counter Tylenol and Percogesic on an as needed (p.r.n.) basis.  Nor did plaintiff testify that he any complaints about the quality of his care during this time period.  As stated earlier, during the hearing, plaintiff praised the care he received from all DOC doctors except Dr. Bates.  In late June 2002, plaintiff was released from the penitentiary, and moved to Panama City, Florida.

Plaintiff did not seek additional neurological assistance until September 17 2002, when he sought treatment from a neurosurgeon named Dr. Stringer at the Brain & Spine Center, in Panama City, Florida. (Exhibit P17).  On that date, plaintiff complained of neck and arm, back and right leg pain.   While Dr. Stringer observed marked tenderness and stiffness to plaintiff's neck, his neurological examination, the results of which were comprehensively recorded, show that, other than the tenderness in plaintiff's neck and difficulty in bending, plaintiff's strength, extension, sensation and reflexes throughout his body were normal.  Dr. Stringer's impression was that plaintiff had pain, and showed "some clinical evidence of nerve root compression cervical and lumbar, worse in the cervical spine area."  Dr. Stringer ordered that x-rays and an MRI of the cervical and lumbar spine be performed, as well as a bone scan.  Dr. Stringer prescribed plaintiff Tylenol with Codeine and Flexaril on an as needed basis.

24

Plaintiff returned to Dr. Stringer for a follow-up visit on October 21, 2002.  Plaintiff complained that his neck, arm, back and leg pains had worsened, although his neck and arm were the source of the most pain.  A neurological examination was again performed with virtually the same results as the previous exam.  Dr. Stringer reported that plaintiff  had completed the x-rays, bone scan and MRI on October 14, 2002.  The x-rays confirmed degenerative changes in the C5-C6 cervical spine. An MRI of the same area show disc protrusion/herniation and displacement of the spinal cord posteriorly.  As to the lumbar spine, Dr. Stringer noticed advanced degenerative changes, worse at L5-S1, with some disc protrusion/early herniation, and some evidence of nerve root compression in the same area.  Dr. Stringer commented that plaintiff's April 18, 2002, x-ray showed degenerative changes of L5-S1.  Regardless, Stringer concluded that plaintiff's MRI cervical spine findings were worse than the MRI lumbar spine.[18]   As treatment, Stringer recommended cervical epidural injections, and prescribed plaintiff Lortab and Robaxin.[19]

Plaintiff's final visit with Dr. Stringer took place on November 27, 2002, and he presented with complaints of increasing pain.  Plaintiff reported to Stringer that he was unable to get the steroid injections or therapy authorized.  A third neurological examination yielded normal to almost normal results.  Yet, plaintiff complained he was in pain and wanted surgery.  Dr. Stringer informed plaintiff that a C5-C6 and C6-C7 diskectomy and fusion was the proper surgery.   Plaintiff never made any

---

[18]    Dr. Bates indicated these MRI results were not impressive, as again, the myelogram previously performed on plaintiff provided a more accurate result.  He also suggested the neurological examinations performed by the medical providers must be considered as part of determining the ultimate diagnosis.

[19]    Plaintiff's bone scan was unremarkable, and though he complained of thoracic pain, the x-ray was unremarkable and there was no evidence of nerve root compression.

arrangements to schedule the surgery.  Other than calling Stringer's office on December 12, 2002, and requesting pain medication and letter from the doctor stating that he could not come to court because of his medication, plaintiff had no further contact with Stringer's office in 2002.  As to his December 12, 2002, request, plaintiff was informed Stringer's office would not write him a letter and that plaintiff could go to court without taking medication.  Plaintiff did receive a small prescription for Robaxin, with no refills.

After careful consideration of the care plaintiff received after leaving HAI in February 2002, the court finds that plaintiff has not produced proof that, more likely than not, his cervical difficulties constituted a serious medical need between October 30, 2000, and February 2, 2002, such that he needed extensive neurological examination from Dr. Bates or prescriptions for pain medication.  The neurological examinations highlighted by plaintiff as support for his serious medical need are actually inapposite to the conclusion he desires the court to draw.

While MRIs and a myelogram did show degenerative[20] changes in his cervical spine, changes that could possibly explain complaints of neck and arm pain (albeit certainly not at the histrionic level plaintiff portrays), plaintiff was offered surgery to correct this condition in September 2000, but refused to do so because he did not want to be placed in a segregation cell.  Moreover, the test findings when combined with objective neurological examinations show that plaintiff consistently exaggerated his symptoms on a regular basis.  This finding is amply supported by the record, and proved by the fact that when offered a cervical diskectomy and fusion in November 2002, the same

---

[20]    Since plaintiff's condition is by nature degenerative, the test results from October 2002, in no way prove the state of plaintiff's condition between October 30, 2000, and February 2, 2002.

26

surgery plaintiff refused to have Dr. Rigsby perform in 2000, plaintiff never contacted Dr. Stringer's office again, except to request pain medications.  Also telling is the fact that once released from prison in June 2002, plaintiff sought no medical assistance of any sort for 3 months, and thereafter, accepted only medical assistance offered in the form of prescription pain medication.

## IV.  Deliberate Indifference.

Since the court finds plaintiff has failed to show by a preponderance of the evidence that he suffered from the serious medical needs heretofore discussed, discussion of the remaining elements of his claims are not necessary.  Nevertheless, the court additionally and alternatively also finds plaintiff has failed to prove by a preponderance of the evidence that Dr. Bates was both deliberately indifferent to his needs and the proximate cause his alleged damages.

Since whether Dr. Bates had notice of plaintiff's condition between October 30, 2000, and July 31, 2001, and from July 31, 2001, to December 1, 2001, is a material element of plaintiff's claim, and plaintiff was aware of the proper manner in which to request medical care, it is important to make a factual determination whether plaintiff filed requests for medical assistance during the aforementioned time period.[21]  In considering whether to credit plaintiff's claims that he daily filled out medical request slip forms, but was ignored between October 30, 2000, and July 31, 2001, and then again until December 1, 2001, the court considers plaintiff's predisposition to complain about

---

[21]     Part and parcel to whether plaintiff is credited with filing those medical request forms is whether plaintiff was, in a constitutional sense, truly suffering from the pain and need for treatment and benefits he so adamantly and floridly describes.  For reasons set out in the "Serious Medical Needs" portion of this opinion, the court finds that plaintiff was not suffering as he alleges, particularly when he admits the pain would come and go.

his medical problems verbally and in writing.  That the tendency is great is undeniable and well supported by plaintiff's persona at the hearing, as well as his pleadings.

Therefore, it is curious in light of this propensity, and his testimony at the hearing, that there is no evidence of the daily medical care request slips plaintiff purportedly filed from October 30, 2000, to July 31, 2001, and then again until December 1, 2001, in his medical records.  Either plaintiff never filed any request slips, the request slips are never placed in or have been removed from the file, or both.

After careful and long consideration of the possible scenarios, the documentary evidence admitted, the testimony given and the record, the court does not credit plaintiff's testimony that he filed medical request slips on a daily basis from October 30, 2000, to July 31, 2001, and thereon through December 1, 2001.  Nor does it credit defendant Bates' assertion that the absence of request slips in the file means plaintiff never wrote a medical request slips.  Nevertheless, Dr. Bates testified, and plaintiff does not dispute, that the prison nurses were allowed to review inmate request slips, and determine which inmates should be seen by Dr. Bates.  The nurse with whom plaintiff consistently made contact was Nursing Director Brandon Kinard[22], and according to plaintiff, Kinard routinely refused to allow him to see Dr. Bates, and informed plaintiff that Dr. Bates would not prescribe medication or benefits.  Plaintiff filed as an exhibit a November 10, 2000, complaint form directed to NaphCare, Inc., in which he declared Brandon Kinard was unreasonably refusing to assist him

---

[22]/   Plaintiff initially filed suit against defendant Kinard as well, but made no specific factual allegations against defendant Kinard in the body of his complaint.  On May 23, 2003, the undersigned entered a report and recommendation in which it was recommended that Kinard be dismissed as a defendant.  (Doc. 36).  Plaintiff filed no objections to the report and recommendation, and on September 22, 2003, the district judge dismissed Kinard as a defendant pursuant to 28 U.S.C. § 1915A.  (Doc. 37 & 38).

with pain medication and benefits.  (Exhibit P14).  Plaintiff testified that each time he asked for help from Nurse Kinard, he was chased off and was never called to see the doctor.

Additional exhibits received from and testimony by plaintiff show that he chose not to use sick call procedure when he arrived at HAI.  The day after plaintiff arrived at HAI, he began writing inmate request slips and letters directly to Warden Owen[23], in which he complained that corrections officers had taken his prescription medication and undefined benefits.   In fact, there are approximately seven (7) letters admitted into evidence which were sent by plaintiff to Owen between October 31, 2000, and November 21, 2000.  (Exhibit P13).

In the exhaustion of grievances section of plaintiff's original complaint, signed December 17, 2001, plaintiff wrote that he filed "a complaint to Medical Dept. and NaphCare and written letter of complaint to M. Halley[,]" but never received a response.  (Doc. 1, at 2).  Of particular importance is the *singularity* of plaintiff's purported complaint to each entity/individual.  Even more telling is that there is *no* mention of the filing of daily medical care request forms without result for 13 consecutive months.  Further, in the body of the pleading itself, plaintiff asserts that he complained many times to Warden Owen, and various other corrections officers about his medical needs but was either ridiculed or never received a response.   Plaintiff directed almost all of the allegations pertaining to his medical conditions against DOC officials in his original complaint.  Not once does he make an allegation with regard to daily medical request slips submitted to the medical department.  In fact, the only factually detailed allegation against Dr. Bates in the original complaint is derived

---

[23]/    Dr. Bates testified he was never contacted by Warden Owen, and plaintiff did not assert he sent any other letters to Warden Owen after November 21, 2000.

from Bates' alleged refusal to examine or assist plaintiff on December 7, 2001.  Finally, plaintiff found no error in and accepted this court's detailed statement of his claims as set out in the Order for Special Report.  (Doc. 39, at 2-4).  Said statement mirrors the description of events herein above.

During his testimony at the evidentiary hearing, plaintiff repeatedly referred to the fact that he was unaware of the full extent of Dr. Bates' involvement in the loss of his medication and benefits until the Department of Corrections was asked to respond to plaintiff's December 2001, complaint and request for emergency injunctive relief. [24]   Plaintiff even credited the court with having discovered the matter.  A careful examination of the summary judgment report and recommendation shows that even at that time, plaintiff did not contend he was filing requests for medical care requests slips on a daily basis.  The chief factual complaint against defendant Bates remained the fact that Bates refused to order plaintiff medically unfit to live in the outside trailer in December 2001.

Plaintiff also initially testified at the evidentiary hearing that he knew the medical request slip procedure and wanted to use the medical care request slip box, but was told by officials to use an inmate request form directed toward employees of the DOC.  Thereafter, he wrote his October and

---

[24]    Plaintiff's initial allegations are a prime example of his tendency to exaggerate his medical condition.  In his original complaint, plaintiff swore that he was in a life or death situation because he was suffering

> from severe life threatening and very painful medical-health (sic) conditions], to wit: extensive degenerative spinal disease, spinal canal and neural foramina stenosis, posterior and midline disc herniating, . . . neural foramina narrowing of [the] spinal canal and the base of the neck, rotatory scoliosis (lateral curvature of the spine) and extensive degenerative disc disease with [an] annular bulge that touches the thecal sac area of the lower back, with multiple spurring throughout the spine . . . . [A]ny 'one' of the above disorders is very painful but . . . the combination [of] spinal disorders and disease all acting in concert . . . [inflicts] pain so intense that it amounts to crushing torture so . . . that every step is anguishingly painful.

Complaint, (Doc. 1, pp. 3-4).  When the finding of Dr. Miller and Dr. Rigsby, as well as Dr. Rigsby's uncontroverted deposition testimony are reviewed, it is apparent that plaintiff was exaggerating his condition.

November 2000, letters to Warden Owen, and filed one medical complaint form to NaphCare, Inc.[25]
It was only after being questioned as to these verifiable documents on the matter that plaintiff, for
the first time in the history of this case, then began to claim he filed medical care request slips on a
daily basis.  Plaintiff's inconsistent revelations are not credible.

Another factual finding based on plaintiff's testimony at the hearing, and intertwined with
the notice afforded Dr. Bates along the allegedly life-threatening seriousness of his condition is the
fact that plaintiff testified the pain and symptoms from his back and neck were not constant, and
would be better at times and worse at other times.  Plaintiff never revealed whether these cycles took
place between October 30, 2000, and February 2, 2002.  Of equal importance is the fact that, at the
evidentiary hearing, plaintiff never voiced a complaint in any detail about the loss of his medication
and benefits while he was housed in the solarium cell.  In fact, he described his ability to access
anywhere in the prison as "easy" from his indoor cell.  Not once did plaintiff attempt to approach
Dr. Bates personally during this time period although Bates' presented uncontroverted testimony that
he was "flooded" with in person medical requests from inmates from the time he entered the prison
until he walked out the door.  It was only after plaintiff was moved to the outdoor trailer that his
campaign began in earnest.  Such behavior does not comport with plaintiff's claims.  Plaintiff has
failed to show, by a preponderance of the evidence, that defendant Bates was deliberately indifferent
to his medical needs or the proximate cause of any alleged damages.

---

[25]     The court recognizes that defendant Bates did not produce this form, but neither did he object to the validity
of same.  Although certainly Bates' failure to provide this form and two other NaphCare care forms generated
in December 2001, raise questions, in light of plaintiff's pleadings  and testimony, the court is quite convinced
that plaintiff did not file medical request slips on a daily basis.  Regardless of the reason for the absence of any
medical request slips, plaintiff does not dispute that it was the job of the nurses to cull through medical request
slips and place inmates on the doctor's list.

## CONCLUSIONS OF LAW

Applying the appropriate standards to the factual findings above, the court finds, as a matter of law, plaintiff failed to prove by a preponderance of the evidence that he suffered from serious medical needs of which defendant Bates was aware of and with deliberate indifference failed to provide him necessary medical care for those needs or that defendant Bates' acts were the proximate or legal cause of any damages.

A separate final judgment consistent with this Memorandum of Decision will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 24th day of March, 2006.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE